UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **PROJECT ON GOVERNMENT OVERSIGHT, INC.** <br> 1100 13th Street, NW <br> Suite 800 <br> Washington, DC 20005, <br><br> **Plaintiff,** <br><br> v. <br><br> **U.S. DEPARTMENT OF THE AIR FORCE** <br> 1740 Air Force Pentagon <br> Washington, DC 20330-1740 <br><br> **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. |

## COMPLAINT

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 220 and 2202, for injunctive, declaratory, and other appropriate relief. Plaintiff Project On Government Oversight, Inc. ("POGO") challenges the failure of defendant U.S. Department of the Air Force (the "Air Force") to provide POGO with all non-exempt portions of documents responsive to a FOIA request POGO filed with the Air Force. POGO's request sought documents related to a report referenced during an April 27, 2022 House Armed Services Committee hearing concerning the A-10/F-35 Close Air Support Flyoff tests conducted by the Air Force between July 5-12, 2018.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28

U.S.C. § 1331.

3. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

4. Plaintiff POGO is a nonpartisan independent organization based in Washington, D.C. and organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and other sources and verify the information through investigations using FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under the FOIA for this investigation.

5. The Air Force is a federal agency within the meaning of the FOIA, 5 U.S.C. § 552(f) and has possession and control of the records POGO seeks in this action.

## STATUTORY BACKGROUND

6. The FOIA requires federal agencies, upon request, to make records "promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless one or more specific statutory exemptions apply.

7. The agency must provide the public records when they are requested in order "to ensure an informed citizenry, vital to the functioning democratic society." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

8. An agency must make a determination on a FOIA request within twenty business days and notify the requester of which of the requested records it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

9. The 20-day deadline for an agency to make a determination on a request begins on the earlier of: (l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is 'first received by any component of the agency that is designated in the agency's regulations' . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

10. In unusual circumstances, an agency may extend the time limits the FOIA prescribes by written notice to the person making such request that sets forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

11. The FOIA grants to requesters the right to administratively appeal any adverse determination an agency makes on their FOIA request. 5 U.S.C. § 552(a)(6)(A). Subject to some exceptions not applicable here, a requester must exhaust administrative remedies before filing suit in federal district court.

## FACTUAL BACKGROUND

*Legislative History of the A-10 vs. the F-35*

3

12. The Air Force had relied on the A-10 for close air support since its deployment in 1976. Development of the F-35 began in the 1990s as a potential replacement for the A-10. *See* https://www.airforcetimes.com/news/your-air-force/2018/03/01/its-the-f-35-vs-a-10-which-one-would-dominate-in-a-fly-off/.

13. In 2016, Michael Gilmore, then-Pentagon director of operational test and evaluation, announced the Pentagon's intention to "do a comparative test of the ability of the F-35 to perform close air support, combat search-and-rescue missions and related missions with the A-10" in order to determine if the F-35 would be a viable replacement for the A-10. *See* https://www.cnn.com/2016/04/28/politics/air-force-f-35-vs-a-10-showdown/index.html.

14. While the F-35 had been designated to replace the A-10 in the Air Force's main ground-attack role by 2022, critics raised a financial concern fearing the $163 million F-35 would not match the capabilities of the $18 million A-10.

15. The 2017 National Defense Authorization Act ("NDAA") extended the prohibition on retirement of the A-10 until the F-35 Joint Strike Fighter completed its initial operational testing and evaluation. *See* https://www.armed-services.senate.gov/imo/media/doc/FY17%20NDAA%20Bill%20Summary.pdf, p. 13.

16. That Act established strict criteria and specific scenarios for the test "[t]o ensure realism under combat conditions[.]" *See* https://www.congress.gov/114/crpt/srpt255/CRPT-114srpt255.pdf, p. 15.

17. Among the list of requirements, the comparative testing was to include, "as a minimum, both pre-planned and emergency divert missions to address effectiveness in realistic complex ground firefight scenarios. These scenarios must include simulated enemy forces in close proximity to friendly forces, where the pilot is required to visually identify the target and

friendly forces in day and night conditions." *Id.* pp. 14-15.

18. The 2018 NDAA included new language providing a possible path for the Air Force to forgo the head-to-head testing between the two aircraft (contravening the Senate's explicit instructions) by authorizing the Air Force to "provide to the congressional defense committees and the Secretary of Defense a report describing the performance of the items or components evaluated as part of the operational test and evaluation for each major defense acquisition program conducted under such section by the Director of Operational Test and Evaluation in relation to comparable legacy items or components, if such items or components exist and relevant data are available without requiring additional testing." *See* 2018 NDAA, Pub. L. No. 115-91, § 839, 131 Stat. 1476 (2017).

19. Plaintiff expressed its concern about this provision in a September 7, 2017 letter to the Senate Armed Services Committee. As Plaintiff explained:

> First, the validity of any comparison to legacy systems' capabilities depends on truly head-to-head comparative field testing rather than on-paper analysis of available "relevant data." This means valid comparative assessments of capability inherently require additional testing. If Pentagon officials and Congress want to make sound decisions about replacing legacy systems, this testing is essential and rarely costly.
>
> Second, the new language is also troubling because its immediate effect would be to undermine previous Congressional legislation prohibiting the retirement of any additional A-10s until the currently planned operational testing of the F-35 versus A-10 close support capabilities is complete.[2] This language would potentially allow the Air Force to skip this testing entirely, exacerbating ongoing attempts to delay or avoid this crucial test and circumventing the Congressional mandate to maintain 171 A-10s in combat-coded status. Air Force leadership has already told Congress it is retiring three squadrons of A-10s despite the mandate and is also underfunding the repairs and maintenance needed to comply with the 171 combat-ready force requirement.

*See* https://www.pogo.org/letter/2017/09/pogo-to-congress-dont-change-testing-standards.

5

*The A-10 vs. F-35 Testing*

20. The Air Force scheduled four days between July 5 through July 12, 2018, for testing the F-35. The tests were not, however, designed to determine the F-35's ability to support ground troops in realistic combat situations—the need that would have to be proven to replace the A-10.

21. "[A]according to sources closely associated with the fly-off, not a single event include[d] ground troops, or any kind of fluid combat situation, which means these tests are hardly representative of the missions a close air support aircraft has to perform." In lieu of the Congressionally mandated testing plan, the Air Force staged an unpublicized test based on unrealistic scenarios that skewed results heavily in favor of the F-35. These tests were designed without consultation from the Air Force's close air support experts. *See* https://www.pogo.org/investigation/2018/07/close-air-support-fly-off-farce.

22. The Air Force outsourced the design of the tests to a consultant "with a contract to provide adversary aircraft to serve as air-combat training opponents for the U.S. Air Force, especially for the F-35 squadrons, which it also does for foreign air forces. In other words, the test was designed by someone with a vested financial interest in the F-35 program, rather than by people whose primary interest is its performance in combat." *Id.*

23. Numerous sources, including some members of Congress, Air Force officials, and members of the press, have questioned the results of the test. *See* https://www.military.com/daily-news/2018/07/14/dod-says-10-vs-f-35-fly-over-will-results-satisfy.html.

24. Additional testing was done in March 2019, and a report was due to Congress at the end of that year. *See* https://www.airandspaceforces.com/pentagon-finishes-f-35-a-10-comparison-testing/.

25. On April 27, 2022, the House Armed Services Committee held a hearing on the Department of Defense's Fiscal Year 2023 Budget Request for Fixed-Wing Tactical and Training Aircraft Programs.

26. During this hearing, the issue of the A-10 versus the F-35 was discussed. Representative Ruben Gallego asked the Air Force officials present to testify to "share any details…about the findings of the A-10/F-35 fly-off and [if] the Air Force plan[ned] to release an unclassified version of the report and if not [were there] any plans to brief Congress on the results in a classified session." *See* https://www.youtube.com/watch?v=8RUiN11j_Rk, at: 1:26:52.

27. Lieutenant General David Nahom, Deputy Chief of Staff for Plans and Programs, U.S. Air Force testified that the report had been made available earlier in 2022, and that the Air Force was pleased to share the results. *Id.* at 1:27:15.

28. Assistant Secretary of the Air Force for Acquisition, Technology, and Logistics, Department of Defense, Andrew Hunter concurred. *Id.* at 1:27:48.

29. According to Representative Gallego, Congress had yet to see this report and had in fact, "been asking for it for quite a while." *Id.* at 1:27:59.

*Plaintiff's FOIA Request*

30. On April 28, 2022, Plaintiff submitted to the Air Force a FOIA request seeking:

> The full report including all supporting material from the A-10/F-35 Close Air Support Flyoff tests conducted between July 5-12, 2018 at Marine Corps Air Station Yuma's open-desert bombing training range, in southern Arizona, and three at Naval Air Weapons Station China Lake's electronic combat range.

31. In its request Plaintiff noted that "[t]he report was mentioned by senior Air Force leaders during the April 27, 2022 hearing before the House Armed Services Committee."

7

32. Plaintiff also sought a waiver of fees associated with processing its request, explaining that its request concerns the operations of the Department of Defense and disclosure of the requested records likely will contribute to a better understanding of relevant government procedures and operations, specifically whether the acquisition programs are meeting their expected performance, citing 5 U.S.C. § 552(a)(4)(A)(iii). POGO stated further that the request primarily and fundamentally is for non- commercial purposes.

33. The Air Force has never acknowledged receipt of the request.

34. To date, Plaintiff has not received any response to its repeated requests for information on the status of its FOIA request or any other response from the Air Force to its April 28, 2022 FOIA request.

35. Under 5 U.S.C. § 552(a)(6)(C)(i), Plaintiff has now effectively exhausted all applicable administrative remedies with respect to its April 28, 2022 request.

**PLAINTIFF'S CLAIM FOR RELIEF**

36. Plaintiff repeats and re-alleges paragraphs 1-35.

37. With its April 28, 2022 FOIA request Plaintiff properly asked for records within the custody and control of the Air Force.

38. Defendant Air Force wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for making a determination on Plaintiff's April 28, 2022 FOIA request.

39. Plaintiff is therefore entitled to injunctive and declaratory relief with respect to the immediate processing and disclosure of the records requested in its April 28, 2022 FOIA request.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Order Defendant to immediately and fully process plaintiff's April 28, 2022 FOIA request and to disclose all non-exempt documents immediately and at no cost to Plaintiff;

(2) Issue a declaration that Plaintiff is entitled to the immediate and expedited processing and disclosure of the requested records at no cost to Plaintiff;

(3) Provide for expeditious proceedings in this action;

(4) Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

(5) Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(6) Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

 /s/ Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, D.C. 20015
(301) 717-6610
weismann.anne@gmail.com

Dated: February 14, 2022        *Attorney for Plaintiff*